### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-21310-KMW

JOSH GATOFF, *et al.*,

      Plaintiffs,

v.

PATRICK HORSMAN,

      Defendant.

_____/

### DECLARATION OF PATRICK HORSMAN IN SUPPORT OF MOTION TO DISMISS

Patrick Horsman hereby declares as follows under penalty of perjury:

1.      My name is Patrick Horsman, the Defendant in the above-captioned action, and being of lawful age and sound mind, under penalty of perjury, hereby depose and state as follows.

2.      I have personal knowledge of the facts stated herein except as otherwise noted. I submit this declaration in support of Defendant's Motion to Dismiss.

3.      I am a Chartered Financial Analyst and an executive formerly associated with Integrated CBD Holdings LLC, among other companies.

4.      In connection with Plaintiffs' investments in Integrated CBD Holdings LLC, Plaintiffs executed the following contractual agreements:

> Josh Gatoff, Subscription Agreement dated September 19, 2019
>
> Allen Gavartin, Subscription Agreement dated March 7, 2019
>
> Scott Lieberman, Subscription Agreement dated September 11, 2019
>
> Andrew May, Subscription Agreement dated September 19, 2019
>
> Scott Silverman, Subscription Agreement dated September 13, 2019
>
> DV Group, LLC, Convertible Promissory Note dated July 31, 2019
>
> Lorber Alpha II, LP, Subscription Agreement dated September 16, 2019

5.      Attached as Ex. A is a true and accurate copy of redacted portions of the Subscription Agreement's terms and conditions. As Ex. A is an exemplar, the terms and conditions were consistent among Plaintiffs as to the unredacted portions presented.[1]

6.      Attached as Ex. B is a true and accurate copy of redacted portions of the Limited Liability Company Agreement of Integrated CBD Holdings LLC dated as of August 16, 2019.

7.      Attached as Ex. C is a true and accurate copy of the first two pages of the "March 2019 Presentation" as referenced in the Complaint.

8.      Attached as Ex. D is a true and accurate copy of the first two pages of the "August 2019 Presentation" as referenced in the Complaint.

9.      Attached as Ex. E is a true and accurate copy of the first two pages of the "November 2019 Presentation" as referenced in the Complaint.

---

[1] Complete and unredacted versions of all documents referenced herein are available to the Court for *in camera* inspection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 10, 2022.

*Patrick Horsman* 2022

PATRICK HORSMAN

# EXHIBIT A

DocuSign Envelope ID: 1C43D2FB-3B89-44BD-98D8-0B137F88FC8F

THE UNITS EVIDENCED BY THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR CERTAIN STATE SECURITIES LAWS.  THE UNITS MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE UNITS UNDER THE SECURITIES EXCHANGE ACT OF 1934, AND SUCH STATE LAWS AS MAY BE APPLICABLE, OR DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.  ADDITIONAL RESTRICTIONS ON TRANSFER OF THE UNITS ARE SET FORTH IN THIS AGREEMENT AND THE OPERATING AGREEMENT.

## SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT (the "Subscription Agreement"), dated 9/19/2019 , 2019 (the "Effective Date"), by and between     Josh Gatoff
("Subscriber") and Integrated CBD Holdings LLC, a Delaware limited liability company (the "Company").

1.      SUBSCRIPTION.  The Subscriber hereby irrevocably subscribes for and agrees to acquire from the Company ▮▮▮▮▮▮ Series A Units (as to be defined in the Limited Liability Company Agreement of the Company, as amended from time to time, which is attached hereto as Exhibit A (the "Operating Agreement")) in the Company (the "Subscribed Units") at a price of ▮▮▮▮▮▮ per Series A Unit for an aggregate of $  50,171.70  (the "Purchase Price"), pursuant to the terms and conditions set forth in this Subscription Agreement and the Operating Agreement.  The Subscriber agrees that if the Company accepts Subscriber's subscription (in the manner set forth in Section 3 below), Subscriber shall immediately deliver a duly executed counterpart signature page to the Operating Agreement to the Company.  Capitalized terms used, but not defined, herein shall have the meanings set forth in the Operating Agreement.

2.      METHOD AND TIMING OF PAYMENT.  Unless the Company otherwise agrees, payment of the Purchase Price must be made by wire transfer of immediately available funds to an account or accounts designated in writing by the Company.  The Purchase Price shall be paid by the Subscriber within three (3) business days after the Company's acceptance of this Subscription Agreement.

3.      ACCEPTANCE OF SUBSCRIPTION.

(a)     The Subscriber understands and agrees that the Company, in its sole discretion, reserves the right to accept or reject this and any other subscription for Subscribed Units at any time prior to the sale of such Subscribed Units, for any reason.

(b)     The subscription herein will be deemed accepted by the Company as determined by the Company in its sole discretion, only upon the Company's written notification to the Subscriber that the Company has accepted the subscription herein by delivering to the Subscriber a copy of the signature page to this Subscription Agreement signed by a duly authorized signatory of the Company.

(c)     In the event that this subscription is rejected, this Subscription Agreement shall thereafter have no force or effect.  Additionally, if this subscription is rejected, (i) the Company shall promptly return to the Subscriber all signature pages that the Subscriber has executed and/or provided pursuant to the terms and conditions of this Subscription Agreement, and (ii) the Subscriber shall promptly return to the Company all documents provided to the Subscriber, including, without limitation, this Subscription Agreement and the Operating Agreement.

4.     SUBSCRIBER'S INVESTMENT REPRESENTATIONS, WARRANTIES AND COVENANTS.

Subscriber hereby represents, warrants and covenants that:

(a)     Subscriber or its representatives are sophisticated investors familiar with the type of risks inherent in an investment in the Subscription Units and, by reason of the Subscriber's or its representative's knowledge and experience in financial and business matters, Subscriber is capable of evaluating the merits and risks of the prospective investment in the Company;

(b)     Subscriber is acquiring the Subscribed Units for Subscriber's own account, as a nominee or agent on behalf of other Persons, for investment purposes only and not with a view to resale or distribution;

(c)     Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to its net worth, its investment in the Subscribed Units will not cause such overall commitment to become excessive, and the investment is suitable for Subscriber when viewed in light of Subscriber's other securities holdings and Subscriber's financial situation and needs;

(d)     Subscriber has adequate means of providing for Subscriber's current needs and personal contingencies and has no need for liquidity in the investment in the Company. Subscriber is able to bear the economic risk of the investment in the Company, and can afford a complete loss of such investment without adversely affecting Subscriber's financial well-being. The investment is suitable for Subscriber when viewed in light of Subscriber's other securities holdings and Subscriber's financial situation and needs;

(e)     Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to Subscriber's net worth or otherwise excessive.  Subscriber has substantial experience in making investment decisions of this type;

(f)     Subscriber recognizes that any investment in the Company involves substantial risk including, the risk of losing all of Subscriber's capital investment in the Company,

2

DocuSign Envelope ID: 1C43D25B3989-44DD-98D8-0B137F88FC8F

and Subscriber has evaluated and fully understands all risks in its decision to purchase Subscribed Units hereunder, including the risks factors set forth on <u>Exhibit B</u> attached hereto;

(g)     Subscriber is an Accredited Investor (as further set forth in <u>Section 8</u> below);

(h)     Subscriber has been furnished with all additional documents and information which Subscriber has requested in writing;

(i)     The Subscriber has performed its own due diligence in connection with its subscription of the Subscription Units and has had a reasonable opportunity to ask questions of and receive answers from qualified representative of the Company concerning the business and financial condition of the Company and the terms and conditions of the Offering and this Subscription Agreement, and all of such questions have been answered to the satisfaction of the undersigned;

(j)     Subscriber has had the opportunity to ask questions of and has received answers from the Company concerning the Company and the Subscribed Units and to obtain any additional information necessary to verify the accuracy of the information furnished;

(k)     Subscriber has relied only on the information set forth herein in determining to acquire the Subscribed Units and acknowledges that the information furnished by the Company does not constitute investment, accounting, legal or tax advice and Subscriber is relying on professional advisors for such advice;

(l)     Subscriber is not relying on the Company or its representatives for tax, legal, accounting or investment advice.  The undersigned has relied on the advice of, or has consulted with, only its own advisors;

(m)     all documents, records and books pertaining to its investment have been made available for inspection by Subscriber and by its consultants, auditors and counsel;

(n)     Subscriber has not paid or given to any third party any commission or other remuneration in connection with the purchase of the Subscribed Units; and Subscriber has not received any public media advertisements and has not been solicited by any form of mass mailing solicitation;

(o)     Subscriber acknowledges that no Subscribed Units may be Transferred (as defined in the Operating Agreement) in the absence of registration under the Securities Act (as defined in the Operating Agreement) and applicable Blue Sky or securities laws or an applicable exemption thereunder;

(p)     any amounts invested in the Company are not and will not be directly or indirectly derived from activities that may contravene federal, state, local or international laws and regulations, including anti-money laundering laws and regulations;

(q)    no "bad actor" disqualifications described in Rule 506(d)(1)(i) through (iii) promulgated under the Securities Act apply to Subscriber or any of its Rule 506(d) Related Parties, and Subscriber shall notify the Company promptly in writing in the event any such disqualification becomes applicable to Subscriber or any of its Rule 506(d) Related Parties hereafter;

(r)    Subscriber is not acquiring the Securities as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar medial or broadcast over television or radio, or presents at any seminar or meeting, or any solicitation of an investment by a person not previously known to Subscriber in connection with investments in securities generally;

(s)    Within five (5) days after receipt of a request from the Company, Subscriber shall provide such information and shall execute and deliver such documents as may be reasonably necessary to comply with any and all state or federal laws and rules and Subscription Units, including but not limited to those related to anti-terrorism and anti-money laundering;

(t)    Subscriber recognizes that the Company was only recently formed in February 2018 and that the investment in the Company is speculative and involves a high degree of risk.  In addition, Subscriber specifically acknowledges Subscriber's understanding that:

(i)    the Company and its direct and/or indirect subsidiaries may in the future decide to incur indebtedness, and the presence of debt creates significant risks including that (1) equity investments in a highly leveraged company, such as the Company and its direct and/or indirect subsidiaries, involve the highest degree of risks and can result in the loss of Subscriber's entire investment, (2) other general business risks, including the effects of a recession, may have a more pronounced effect, and (3) lending institutions may have rights to participate in certain decisions relating to the management of the Company and its direct and/or indirect subsidiaries;

(ii)    the consideration for which the Subscribed Units is being issued pursuant to this Subscription Agreement may not be indicative of the fair market value of the Subscribed Units;

(iii)    an investor that is a minority owner in the Company will have limited control over or influence in the management of the Company;

(iv)    decline in economic conditions, or a loss of customers, could materially and adversely affect the Company's and its direct and/or indirect subsidiaries' business, results of operation and financial condition; and

(v)    the Company (or an affiliate thereof) may make acquisitions of other businesses in the future and/or engage in additional financings, either of which could dilute Subscriber's existing ownership or adversely affect Subscriber's priority upon a sale of the Company or other liquidity event.

(u)    Subscriber acknowledges that the Offering is part of a larger offering of up to $30,000,000 of Series A Units (which amount may be increased in the Company's sole

DocuSign Envelope ID: 7C43D25B3B69-44DD-98D8-0B137F88FC8F

discretion) which may be issued by the Company to other investors pursuant to subscription agreements; there is no minimum amount of Series A Units required to be sold and the Subscriber may be the only purchaser;

(v)     To the extent Subscriber is an entity, Subscriber was not formed for the purpose of investing in the Company or otherwise purchasing the Securities;

(w)     Subscriber represents that (i) Subscriber is at least twenty-one (21) years of age (if Subscriber is an individual); (ii) Subscriber was duly formed in accordance with the laws of its jurisdiction of formation and is in good standing in such jurisdiction (if Subscriber is an entity); and (iii) Subscriber has full capacity, power and authority to execute and deliver this Agreement and all other related agreements or certificates and to carry out the provisions hereof and thereof;

(x)     Subscriber has duly executed and delivered this Subscription Agreement and the execution, delivery and performance by Subscriber of this Subscription Agreement will not conflict with or violate any provision of any agreement or instrument to which Subscriber is a party;

(y)     this Subscription Agreement is the legal, valid and binding obligation of Subscriber enforceable against Subscriber in accordance with the terms of this Subscription Agreement; and

(z)     Subscriber understands the meaning and legal consequences of the foregoing representations and warranties and acknowledges and agrees that the Company is relying upon the representations and warranties made herein in determining to sell Subscriber the Subscribed Units; and Subscriber certifies that each of the foregoing representations and warranties is true and correct as of the date hereof and shall survive the execution hereof and the purchase of the Subscribed Units.

5.     COMPANY'S REPRESENTATIONS AND WARRANTIES.

The Company hereby represents and warrants that:

(a)     the Company has full legal capacity and power to execute and deliver this Subscription Agreement and any other agreements or instruments executed by it in connection herewith and to consummate the transactions contemplated herein or therein;

(b)     this Subscription Agreement and the Operating Agreement are the legal, valid and binding obligation of the Company enforceable against the Company in accordance with the terms of this Subscription Agreement;

(c)     the execution and delivery of this Subscription Agreement by the Company and the issuance of the Subscribed Units contemplated herein will not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under (i) the organizational documents of the Company, (ii) any law, order or agreement applicable to the

DocuSign Envelope ID: 1C43D2F8-CB89-41BB-98B2-0B127F88FC3F

Company or by which any property or asset of the Company is bound or affected or (iii) any agreement, lease or other instrument or obligation to which the Company is a party; and

(d)     the Subscribed Units to be issued hereunder will be duly authorized, validly issued, fully paid and nonassessable, and free and clear of all liens, preemptive rights, rights of first refusal, subscription and similar rights (other than those arising under the agreements entered into on the Effective Date by Subscriber, including the Operating Agreement).

6.     <u>TRANSFER RESTRICTIONS</u>.

(a)     Subscriber represents that Subscriber understands that the sale or transfer of the Subscribed Units are severely restricted and that: (i) the Subscribed Units have not been registered under the Securities Act or the laws of any state or other jurisdiction; (ii) the Subscribed Units cannot be sold or transferred by Subscriber unless the Subscribed Units are subsequently registered under applicable law or an exemption from registration is available; (iii) the Company is not required to register the Subscribed Units to make any exemption from registration available; and (iv) there is no public market and there may not be a public market for the Subscribed Units and Subscriber may not be able to sell the Subscribed Units.  Accordingly, Subscriber must bear the economic risk of the investment for an indefinite period of time; and

(b)     Subscriber agrees that the Subscribed Units are subject to the terms of the Operating Agreement, including the transfer restrictions set forth therein, and that Subscriber will not sell or offer to sell or transfer the Subscribed Units or any part thereof or interest therein (i) without registration under the Securities Act and applicable state securities laws or an exemption from such registration, and (ii) unless such sale or offer to sell or transfer is in accordance with the terms of the Operating Agreement.  A legend indicating that the Subscribed Units have not been registered will be placed on any certificates representing the Subscribed Units delivered to Subscriber or any substitutes therefor (in the event that the Company elects to issue such certificates) and any transfer agent of the Company will be instructed to comply therewith.

7.     <u>INDEMNIFICATION AND HOLD HARMLESS</u>.  Subscriber indemnifies and holds harmless the Company and its managers, officers, employees, members, financial advisors, attorneys and accountants against any claim, liability, loss, damage or expense (including attorneys' fees and other costs of investigating and litigating claims) caused, directly or indirectly, by Subscriber's breach of any agreement, representation or warranty Subscriber has made in this Subscription Agreement or the Operating Agreement.

8.     <u>ACCREDITED INVESTOR STATUS</u>.

Subscriber represents that Subscriber is an "accredited investor" defined in Rule 501 of the Securities Act because (please initial as appropriate):

**a.  Individuals**



*Initial*

i.  Subscriber has an individual net worth[1], or joint net worth with his or her spouse, in excess of $1,000,000;



_____
*Initial*

ii.  Subscriber had individual income[2] (exclusive of any income attributable to his or her spouse) of more than $200,000 in each of the past two years, or joint income with his or her spouse of more than $300,000 in each of those years, and reasonably expects to reach the same income level in the current year; or

_____
*Initial*

iii.  Subscriber is a director or executive officer of the Company.

**b.  Corporations, Foundations, Endowments, Partnerships or Limited Liability Companies**

_____
*Initial*

i.  Subscriber has total assets in excess of $5,000,000 and was not formed for the specific purpose of acquiring the Units offered; or

_____
*Initial*

ii.  Each of Subscriber's equity owners is an accredited investor as described in this Section.  The Company, in its sole discretion, may request information regarding the basis on which such equity owners are accredited.

**c.  Employee Benefit Plans**

---

[1] For purposes of this Subscription Agreement, the term "net worth" means the excess of total assets at fair market value, including home furnishings and automobiles, over total liabilities; *provided* that, (i) Subscriber's primary residence shall not be included as an asset, (ii) indebtedness that is secured by Subscriber's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of the Series A Preferred Units, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of the Series A Preferred Units exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability), and (iii) indebtedness that is secured by Subscriber's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of the Series A Preferred Units shall be included as a liability.

[2] For purposes of this Subscription Agreement, the term "individual income" means adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest income under Section 103 of the Code, received; (ii) the amount of losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040; (iii) any deduction claimed for depletion under Section 611 et seq. of the Code; (iv) amounts contributed to an Individual Retirement Account (as defined in the Code) or Keogh retirement plan; (v) alimony paid; and (vi) any elective contributions to a cash or deferred arrangement under Section 401(k) of the Code



_____
*Initial*

    i.    Subscriber is an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), and the decision to invest in the Company was made by a plan fiduciary (as defined in Section 3(21) of ERISA), which is either a bank, savings and loan association, insurance company or registered investment adviser. The name of such plan fiduciary is:

_____
*Initial*

    ii.    Subscriber is an employee benefit plan within the meaning of ERISA and has total assets in excess of $5,000,000; or

_____
*Initial*

    iii.    Subscriber is a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, and has total assets in excess of $5,000,000.

**d. Individual Retirement Accounts, Keogh Plans and Other Self-Directed Defined Contribution Plans**

_____
*Initial*

    i.    Subscriber is an individual retirement account, Keogh Plan or other self-directed defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account and the investing participant is an accredited investor because such participant has an individual net worth, or joint net worth with his or her spouse, in excess of $1,000,000 or has had an individual income of more than $200,000 in each of the past two years, or joint income with his or her spouse of more than $300,000 in each of those years and reasonably expects to reach the same income level in the current year. *The Company, in its sole discretion, may request information regarding the basis on which such participants are accredited.*

**e. Section 501(c)(3) Organizations**

_____
*Initial*

    i.    Subscriber is an organization described in Section 501(c)(3) of the Code, was not formed for the specific purpose of acquiring the Units offered and has total assets in excess of $5,000,000.

**f. Trusts**

_____
*Initial*

    i.    Subscriber has total assets in excess of $5,000,000, was not formed for the specific purpose of acquiring the Units offered and its purchase is directed by a sophisticated person. *As used in the foregoing sentence, a "sophisticated person" is one who has such knowledge and experience in*

> *financial and business matters that it is capable of evaluating the merits and risks of the prospective investment*; or

_____   ii.   Subscriber is: (a) a bank as defined in Section 3(a)(2) of the Securities Act, a savings and loan association, or other institution as defined in Section 3(a)(5)(A) of the Securities Act; (b) acting in a fiduciary capacity; and (c) subscribing for the purchase of the interests being offered on behalf of a trust account or accounts; or

*Initial*

_____   iii.   Subscriber is a revocable trust which may be amended or revoked at any time by the grantors thereof and all of the grantors are accredited investors as described herein.  *The Company, in its sole discretion, may request information regarding the basis on which such grantors are accredited.*

*Initial*

### g.   Banks, Savings and Loans and Similar Institutions

_____   i.   Subscriber is a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association, or other institution as defined in Section 3(a)(5)(A) of the Securities Act acting in its individual capacity.

*Initial*

### h.   Insurance Companies

_____   i.   Subscriber is an insurance company as defined in Section 2(13) of the Securities Act.

*Initial*

### i.   Other Entities

_____   i.   Subscriber is a broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934;

*Initial*

_____   ii.   Subscriber is an investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act;

*Initial*

_____   iii.   Subscriber is a Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; or

*Initial*

_____   iv.   Subscriber is a private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940.

*Initial*

DocuSign Envelope ID: 1C43D2F8-C889-4J8B-98B2-0B127F88FC3F

9.      NOTICES.  All notices hereunder shall be in writing and shall be deemed to have
been duly given if (a) personally delivered, (b) delivered by telecopier, (c) mailed by registered or
certified mail, return receipt requested, (d) dispatched by an overnight courier, or (e) delivered by
electronic mail.  Notices to the Company shall be addressed to Integrated CBD Holdings LLC,
9237 E.  Via De Ventura Blvd., Suite 220, Scottsdale, AZ 85258, Attn: Patrick Horsman, and to
Subscriber at the address set forth on the signature page hereto, and such notice shall be deemed
to have been given as of the day personally delivered or sent by telecopier or electronic mail, or as
of the third day after being so mailed or as of the first day after being dispatched by overnight
courier.  If Subscriber's address is outside the continental United States, such notice shall be given
both in writing as provided above and simultaneously by telecopier or other electronic means.

10.      IRREVOCABILITY; BINDING EFFECT.  The Subscriber hereby acknowledges
and agrees, subject to the limitations contained herein, that the subscription hereunder is
irrevocable, that the Subscriber is not entitled to cancel, terminate or revoke this Subscription
Agreement or any agreements of the Subscriber hereunder and that this Subscription Agreement
or any agreements shall survive the death or disability of the Subscriber and shall be binding upon
and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal
representatives and assigns.  If the Subscriber is more than one person, the obligations of the
Subscriber hereunder shall be joint and several and the agreements, representations, warranties and
acknowledgements herein contained shall be deemed to be made by and be binding upon each
such person and such person's heirs, executors, administrators, successors, legal representatives
and assigns.

11.      MISCELLANEOUS.  This Subscription Agreement and the Operating Agreement
state the entire understanding between the parties with respect to the subject matter hereof, and
supersede all prior oral and written communications and agreements.  If any provision of this
Subscription Agreement is construed to be invalid, illegal or unenforceable, then the remaining
provisions hereof shall not be affected thereby and shall be enforceable without regard thereto.
Section headings in this Subscription Agreement are for convenience of reference only, do not
constitute a part of this Subscription Agreement, and shall not affect its interpretation.  The parties
hereto acknowledge and agree that this Subscription Agreement has been negotiated at arm's-
length and among parties equally sophisticated and knowledgeable in the matters dealt with in this
Subscription Agreement.  Accordingly, any rule of law or legal decision that would require
interpretation of any ambiguities in this Subscription Agreement against the party that has drafted
it is not applicable and is waived.  No amendment of any provision of this Subscription Agreement
shall be valid unless the same shall be in writing and signed by each of the parties hereto.  Any
party hereto may waive another party's breach of or compliance with this Subscription Agreement,
but any waiver must be in a writing signed by the waiving party.  A party's waiver does not waive
any other earlier, concurrent, or later breach or compliance.  This Subscription Agreement is made
under, and shall be construed and enforced in accordance with, the laws of the State of Delaware
applicable to agreements made and to be performed solely therein, without giving effect to
principles of conflicts of law.  Any legal action arising out of or based upon this Subscription
Agreement or Subscriber's ownership of the Subscribed Units shall be settled exclusively in
accordance with Section 13.03 and 13.04 of the Operating Agreement.  This Subscription
Agreement may be executed through the use of separate signature pages or in any number of
counterparts, including by facsimile or other electronic transmission, and each of such counterparts

DocuSign Envelope ID: 1C43D2FB-CB8B-41BB-98B2-0B127F88EC3F

shall, for all purposes, constitute one agreement binding on all parties, notwithstanding that all parties are not signatories to the same counterpart.  Neither this Subscription Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by the Company or Subscriber without the prior written consent of the other party hereto.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Subscription Agreement to be duly executed as of the date first written above.

**SUBSCRIBER:**

IF SIGNATORY IS A NATURAL PERSON:

Please submit all executed documents to IR@Integrated-CBD.com

Sign Name: *Josh Gatoff*
8CC595832C304BF...

Print Name: Josh Gatoff

IF SIGNATORY IS AN ENTITY:

Name: _____

By: _____

Print Name: _____

Title:

Address:

35 Horseshoe Lane

Roslyn Heights, NY 11577

Email: Josh@Doorautomation.com

Phone: 5166723557

**ACCEPTED AND AGREED:**

**INTEGRATED CBD HOLDINGS LLC**

By: _____
Name: Patrick Horsman, CFA
Title:  President

# EXHIBIT A

**Operating Agreement**

See Attached.

DocuSign Envelope ID: 1C43D2F8-C889-41BB-98B9-0B127F88F03F

**EXHIBIT B**

**Risk Factors**

An investment in the Subscribed Units offered hereby is highly speculative and involves a high degree of risk.  An investment should be made only by investors who can afford the loss of their entire investment.  Each prospective investor, prior to making an investment decision, should carefully consider the following risk factors in addition to, and in conjunction with, all of the other information provided in the Subscription Agreement dated 9/19/2019, 2019 and the Operating Agreement.  The Risk Factors reflected below are not intended to be an exhaustive list of all risks involved, but merely a representative listing of certain of those risks currently contemplated by the Company.

**Risks Relating to the Regulations Governing the Company**

***Our business is subject to State and US Federal regulations, the failure to comply with would have a material adverse effect on our business, financial condition and results of operations.***

Our business is dependent upon obtaining a license from the The Arizona Department of Agriculture to plant and farm Hemp which may take longer to obtain than expected or may never be obtained, which would have a materially negative impact on our ability to generate revenue in 2019 or at all.  There can be no assurances that we will receive such a license in a timely manner or at all.

Under the current Federal Food, Drug, and Cosmetic Act ("FD&C Act"), it is illegal to introduce food containing added Cannabidiol ("CBD") or Tetrahydrocannabinol ("THC") into interstate commerce, or to market CBD or THC products as, or in, dietary supplements, regardless of whether the substances are hemp-derived.  This is because both CBD and THC are active ingredients in US Federal Food and Drug Administration ("FDA")-approved drugs and were the subject of substantial clinical investigations before they were marketed as foods or dietary supplements.  Under the FD&C Act, it is illegal to introduce drug ingredients like these into the food supply, or to market them as dietary supplements.  As wholesalers of raw material, we do not believe that our operations will be in violation of the current FD&C Act, however if there is not a change in the current stance of the FDA or the FDA decides to become more aggressive with enforcement, this will have a negative impact on demand for Hemp and its derivatives.

In addition, the FDA could impose further packaging, labelling and advertising restrictions on our customers which could have a negative impact on our customer's demand for Hemp-derived CBD products.  Changes, if any, in the laws, regulations and policies relating to the advertising, production, sale and use of Hemp and Hemp derived products or shifts in political attitude related thereto, may adversely affect the operations or profitability of our business.  Any restrictions on advertising, production, price controls, increased income taxes, and water use restrictions would also have a negative impact on our business.

The successful execution of our business objectives is contingent upon obtaining all necessary licenses and permits under applicable laws and regulatory requirements and complying with all applicable laws and regulatory requirements in the United States and the State of Arizona.  The

failure to obtain such licenses and permits and comply with applicable laws and regulations would have a material adverse effect on our business, financial condition and results of operations.

***As a result of strict regulatory requirements, we may be obligated to destroy our products.***

Although we will establish detailed procedures for testing our Hemp products in our own lab, there can be existence of a crop where levels of THC rise above the legal limit causing us to have to destroy crop in order to comply with US Federal and State regulations.  If we are obligated to destroy crop, we will have incurred costs for purposes of creating that crop and will not have an ability to generate revenues from the destroyed crop, which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

***If we are not able to comply with all safety, health and environmental regulations applicable to our operations and industry, we may be held liable for any breaches of those regulations.***

Safety, health and environmental laws and regulations affect nearly all aspects of our operations, including product development, working conditions, waste disposal, emission controls, the maintenance of air and water quality standards and land reclamation, and, with respect to environmental laws and regulations, impose limitations on the generation, transportation, storage and disposal of solid and hazardous waste.  Continuing to meet GMP standards, which we follow voluntarily, requires satisfying additional standards for the conduct of our operations and subjects us to ongoing compliance inspections in respect of these standards.  Compliance with safety, health and environmental laws and regulations can require significant expenditures, and failure to comply with such safety, health and environmental laws and regulations may result in the imposition of fines and penalties, the temporary or permanent suspension of operations, the imposition of clean-up costs resulting from contaminated properties, the imposition of damages and the loss of or refusal of governmental authorities to issue permits or licenses to us or to certify our compliance with GMP standards.  Exposure to these liabilities may arise in connection with our existing operations, our historical operations and operations that may in the future be closed or sold to third parties.  We could also be held liable for worker exposure to hazardous substances and for accidents causing injury or death.  There can be no assurance that we will at all times be in compliance with all safety, health and environmental laws and regulations notwithstanding our attempts to comply with such laws and regulations.

Changes in applicable safety, health and environmental standards may impose stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees.  We are not able to determine the specific impact that future changes in safety, health and environmental laws and regulations may have on our industry, operations and/or activities and our resulting financial position; however, we anticipate that capital expenditures and operating expenses will increase in the future as a result of the implementation of new and increasingly stringent safety, health and environmental laws and regulations.  Further changes in safety, health and environmental laws and regulations, new information on existing safety, health and environmental conditions or other events, including legal proceedings based upon such conditions or an inability to obtain necessary permits in relation thereto, may require increased compliance expenditures by us.

2

**Risks Relating the Efficacy of the Company's Products**

***There has been limited study on the effects of CBD on the human body and negative outcomes of future studies may have a material adverse effect on our business, financial condition and results of operations.***

There has been limited study on the effects of CBD on the human body and future clinical research studies may lead to conclusions that dispute or conflict with our understanding and belief regarding the viability, safety, efficacy and dosing.  Any negative outcomes from these studies could have a material adverse effect on our business, financial condition and results of operations.

***We may be required to recall our products.***

If any of our customers' products are recalled due to an alleged product defect or for any other reason, we could be required to incur the unexpected expense of the recall and any legal proceedings that might arise in connection with the recall.  As a result of any such recall, we may lose a significant amount of sales and may not be able to replace those sales at an acceptable margin or at all.  In addition, a product recall may require significant management attention or damage our reputation and goodwill or that of our products.

***We may be subject to product liability claims or regulatory action if our customer's products are alleged to have caused significant loss or injury.***

As a manufacturer of the raw materials that are inputs into products which may be ultimately ingested by humans, we face the risk of exposure to product liability claims, regulatory action and litigation if our raw materials are alleged to have caused loss or injury.  We may be subject to these types of claims due to allegations that our inputs caused or contributed to injury or illness.  Adverse reactions resulting from human consumption of CBD and other Hemp derivatives alone or in combination with other medications or substances could also occur.  In addition, the manufacture and sale of Hemp derived products, like the manufacture and sale of any ingested product, involves a risk of injury to consumers due to tampering by unauthorized third parties or product contamination.  A liability claim or regulatory action against us could result in increased costs and could adversely affect our reputation and goodwill with our customers and consumers generally.  There can be no assurance that we will be able to maintain product liability insurance on acceptable terms or with adequate coverage against all potential liabilities.  Such insurance is expensive and may not be available in the future on acceptable terms, or at all.  The inability to obtain sufficient insurance coverage on reasonable terms or to otherwise protect against potential product liability claims could result in us becoming subject to significant liabilities that are uninsured and also could adversely affect our commercial arrangements with third parties.

**Risks Related to Our Industry**

***Our business is subject to the risks inherent in an agricultural business.***

We grow Cannabis Sativia L with less than .3% of THC content which is defined in the 2018 Farm Bill as Hemp.  Growing Hemp is an agricultural process.  As such, our business is subject to the risks inherent in the agricultural business, including risks of crop failure presented by weather,

DocuSign Envelope ID: 1C43D2FB-C882-41BB-98B2-0B127F88FC3F1

insects, plant diseases, shortage of qualified labor and similar agricultural risks. Although we grow our crop in Arizona which tends to have very favorable weather conditions, there can be no assurance that natural elements, such as weather, insects and plant diseases, will not entirely interrupt our production activities or have an adverse effect on our business. While it is not clear at this time if United States Department of Agriculture ("USDA") sponsored crop insurance will be available for Hemp farmer's during the 2019 grow season, the 2018 Farm Bill is clear that Hemp producers will have access to federal crop insurance eventually.

***Our business may be affected by natural catastrophes and severe weather conditions.***

Our operations may be adversely affected by severe weather including wind, hail and rain, which may result in our operations having reduced harvest yields due to lower light levels, or a more catastrophic event such as losing all of our crop to a powerful hailstorm, dust storm or flood. Although we anticipate and factor in certain periods of lower than optimal light levels, extended periods of severe or unusual light levels may prevent our ability to deliver products in accordance with our agreements or otherwise adversely impact our financial results due to higher costs and missed sales opportunities arising from reduced production yields.

Climate change over time is predicted to lead to changes in the frequency of storm events as well as their severity. We are unable to predict the impact of climate change on our business.

***Our business depends on our ability to secure a reliable source of Hemp seeds.***

Our operations depend on our ability to secure and obtain supply of industrial quality Hemp seeds suitable for growing industrial grade Hemp. There are currently a limited number of suppliers of industrial quality Hemp seeds and we have not secured a long-term supply contract with any one supplier. Industrial quality Hemp seeds are also in high demand and there may be a shortage of the availability of such seeds in the future or the price of such seeds may become prohibitively high based on high demand and shortage of supply. We have entered into a supply agreement with a sole source supplier for approximately 12,000,000 seeds, which we expect to satisfy our needs for the 2019 growing season. If our supplier fails to deliver the Hemp seeds in a timely manner or at all, we may not be able to obtain an alternative source. If we are unable to secure a long-term contract for the supply of industrial quality Hemp seeds in the future, we may experience a material adverse effect on our future production, our business, prospects, financial condition, results of operations and cash flows.

***Our operations may be adversely affected by fluctuating prices of raw materials.***

Our revenues will in large part be derived from the production, sale and distribution of CBD-based and Hemp products. The price of production, sale and distribution of, CBD-based and Hemp products will fluctuate widely due to, among other factors, how young the CBD/Hemp industry is and the impact of numerous factors beyond our control including international, economic and political trends, expectations of inflation, currency exchange fluctuations, interest rates, global or regional consumptive patterns, speculative activities and increased production due to new production and distribution developments and improved production and distribution methods. The effects of these factors on the price of product produced by us and, therefore, the economic viability

of our business, cannot accurately be predicted. This may have a material adverse effect on our business, prospects, financial condition, results of operations and cash flows.

**Risks Related to the Company**

*Lack of Operating History of the Company.*

We have a limited operating history, which does not afford investors the ability to evaluate our future revenue prospects. Additionally, to date we have not generated any revenue and have incurred substantial losses and we may not achieve or maintain profitability in the future. We intend to expend significant funds to purchase seeds and genetics, farm and harvest Hemp, and design and build a state of the art GMP certified, food and ultimately pharma grade extraction facility capable of extracting 100 tons per day of Hemp biomass, invest in research and development and to continue to expand our team in order to execute on our business plan. There will also be significant cost requirements associated with our transition to a public company. As we continue to grow, we expect the aggregate amount of these expenses will also continue to grow.

*Limited access to capital resources could adversely affect our results of operations and financial condition.*

We have limited access to financial resources. An inability on our part to access funding may lead to an inability to finance our operations and meet short-term financial obligations as they become due, which in turn could materially adversely affect our results of operations and financial condition. If additional financing is not available when required or is not available on favorable terms, we may be unable to take advantage of business opportunities or respond to competitive pressures, any of which could have a material adverse effect on our business and prospects.

Our access to sufficient funding may be impaired by any significant action taken by regulatory authorities against us or by harm to our reputation. In addition, our ability to access sufficient funding may be impaired by factors that are not specific to us, such as general market conditions, severe disruption of the financial markets or negative views about the prospects for the industries in which we operate.

*We may need to finance our growth through debt financing, which may not be available to us on reasonable terms, if at all, and will likely subject us to covenants.*

From time to time, we may enter into transactions to acquire assets or the capital stock or other equity interests of other entities. Our continued growth may be financed, wholly or partially, with debt, which may increase our debt levels above industry standards. In addition, there can be no assurance that debt financing will be available to us on reasonable terms, if at all. Any debt financing secured in the future could also involve restrictive covenants relating to capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities, including potential acquisitions. Debt financings may also contain provisions that, if breached, may entitle lenders or their agents to accelerate repayment of loans or realize upon security over our assets, and there is no assurance that we would be able to repay such loans in such an event or prevent the enforcement of security granted pursuant to any such debt financing.

***We may not be able to secure adequate or reliable sources of funding required to operate our business and execute on our business plan.***

The continued development of our business will require significant additional financing following the closing of this Offering, and there is no assurance that we will obtain the financing necessary to be able to achieve our business objectives.  Such financing will be used to, among other things, construct an extraction and isolation facility, design and build greenhouses, harvest and extract crop and conduct research and development.  Our ability to obtain additional financing will depend on investor demand, our performance and reputation, economic and market conditions and other factors.  Our inability to raise such capital could result in the delay or indefinite postponement of our current business objectives or in our inability to continue to carry on our business.  There can be no assurance that additional capital or other types of financing will be available if needed or that, if available, the terms of such financing will be favorable to us.

***Our efforts to grow our business may be costlier than anticipated.***

Our efforts to grow our business may be costlier than we expect, and we may not be able to increase our revenue enough to offset higher operating expenses.  We may incur significant losses in the future for a number of reasons, including as a result of unforeseen expenses, difficulties, complications and delays, the other risks described herein and other unknown events.

***We do not have any customers and, as a result, we have not earned any revenue to date.***

We have not yet secured any purchase orders or contracts with any customers.  Our ability to execute on our business plan and to produce revenue is contingent on our ability to secure purchase orders or enter into forward supply contracts with our customers which may never happen.  If we are unable to sell our products to our intended customers, we will incur significant loss and may not be able to continue operations.  The amount of future net losses will depend, in part, on the growth of our future expenses and our ability to generate revenue.  If we incur losses in the future this will have a material adverse effect on our business, financial condition and results of operations.  Because of the numerous risks and uncertainties associated with producing Hemp derived products, as outlined herein, we are unable to accurately predict when, or if, we will be able to achieve and sustain profitability.  If we are unable to achieve and sustain profitability, our valuation will decrease and our ability to raise capital, expand our business or continue our operations may be impaired.  A decline in our value may also cause you to lose all or part of your investment.

***We may be unable to achieve our projected revenue growth.***

Our ability to achieve our projected revenue growth will depend on a number of factors, many of which are beyond our control, including, but not limited to, the availability of sufficient capital on suitable terms, changes in laws and regulations respecting the production of Hemp products, competition from others, and our ability to produce sufficient volumes of our Hemp products to meet demand.  In addition, we are subject to a variety of business risks generally associated with developing companies.  Future development and expansion could place significant strain on our management personnel and likely will require us to recruit additional management personnel, and there is no assurance that we will be able to do so.

***We may be unable to expand our operations quickly enough to meet demand or manage our operations to the scale we intend to.***

There can be no assurance that we will be able to manage our expanding operations, including any acquisitions, effectively, that we will be able to sustain or accelerate our growth or that such growth, if achieved, will result in profitable operations, that we will be able to attract and retain sufficient management personnel necessary for continued growth or that we will be able to successfully make strategic investments joint ventures or acquisitions.

***We may be unable to attract or retain key personnel with sufficient experience in the Hemp industry, and we may be unable to attract, develop and retain additional employees required for our development and future success.***

Our success is largely dependent on the performance of our management team and certain employees and our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. Qualified individuals are in high demand, and we may incur significant costs to attract and retain them. The loss of the services of any key personnel, or an inability to attract other suitably qualified persons when needed, could prevent us from executing on our business plan and strategy, and we may be unable to find adequate replacements on a timely basis, or at all. We do not currently maintain key-person insurance on the lives of any of our key personnel.

***Significant interruptions in, or cost increases for, our access to certain key inputs such as raw materials, electricity, water and other utilities may impair our growing and extraction operations.***

Our business is dependent on a number of key inputs and their related costs, including raw materials, supplies and equipment related to our operations, as well as electricity, water and other utilities. Any significant interruption, price increase or negative change in the availability or economics of the supply chain for key inputs and, in particular, rising or volatile energy costs could curtail or preclude our ability to continue production. In addition, our operations would be significantly affected by a prolonged power outage.

***Our operations may be negatively affected by transportation disruptions.***

Due to the perishable and premium nature of our products, we will depend on third parties for fast and efficient road transportation to distribute our product. Any prolonged disruption of this transportation network could have an adverse effect on our financial condition and results of operations.

***Our business model is dependent upon our ability to successfully design and construct our own processing facility.***

Our ability to extract full spectrum hemp oil and CBD distillate, isolate and water-soluble products is dependent on the design and construction of our own processing facility which will require in-house engineering expertise, the expertise of third-party general contractors and design firms. In addition, we will need to raise significant capital to construct the facility, which may not be available to us on reasonable terms, if at all. While we believe we have the necessary expertise to

design and construct an extraction facility capable of processing 100 tons of bio mass per day, there can be no assurances that we will ultimately be successful at building and constructing the plant, the failure of which may have a material adverse effect of our business, financial condition and results of operations.

***Our ability to grow our product is dependent on our ability to continue to lease land from our related party landlord, Integrated Ag LP***

We do not currently own the land we plan to use for growing our product and we depend on leasing such land from Integrated Ag LP, which is a related party entity. While we seek ways to continue to operate by securing additional alliances or other partnership agreements, we do not at this time have any commitments or agreements that provide for additional land leases. Although we have a long-term land lease, if we default on our lease, we would have to suspend our operations until we secure adequate access to alternative land to grow our crops.

***Our business and products are subject to physical security risks.***

Our business and products are subject to physical security risks. We may experience breaches of security at our facilities or loss as a result of theft of our products. Because of the high value our products as well as the concentration of inventory in our facilities, we are subject to the risk of theft of our products and other security breaches. A security breach at our extraction facility once completed could result in a significant loss of available product, expose us to additional liability under applicable regulations and to potentially costly litigation or increase expenses relating to the resolution and future prevention of similar theft. In addition, a breach of security during transport or delivery also could result in the loss of high value product. Any breach of security or theft or loss of product as a result of a breach of security or theft could have a material adverse effect on our business, financial condition and results of operations.

***Risks Related to the Verified Organic Joint Venture***

We currently have a joint venture with Verified Organic, a blockchain platform that tracks and verifies the organic growing processes of Hemp. Our future cash flows, earnings, results of operations and financial condition will in part depend on our continued participation in this joint venture. Patrick Horsman, our President, is the founder of Verified Organic. Any strain on, or breakdown of, the working relationship between us and Verified Organic could adversely affect the governance and operations of the joint venture.

***Our business and our products are subject to consumer and investor perception, which is difficult to gauge and predict.***

We believe that the Hemp and CBD industry is highly dependent upon positive consumer and investor perception regarding the benefits, safety, efficacy and quality of the Hemp derived products distributed to consumers. Perception of the CBD industry and Hemp derived products, currently and in the future, may be significantly influenced by scientific research or findings, regulatory investigations, litigation, political statements, media attention and other publicity (whether or not accurate or with merit) including unexpected safety or efficacy concerns arising with respect to Hemp products. There can be no assurance that future scientific research, findings,

DocuSign Envelope ID: 1C43D2F8-C88C-41BB-98B2-0B127F88FC3F1

regulatory proceedings, litigation, media attention or other research findings or publicity will be favorable to the Hemp market.  Adverse future scientific research reports, findings and regulatory proceedings that are, or litigation, media attention or other publicity that is, perceived as less favorable than, or that questions, earlier research reports, findings or publicity (whether or not accurate or with merit) could result in a significant reduction in the demand for our products.  Further, adverse publicity reports or other media attention regarding the safety, efficacy and quality of Hemp and its derivatives or associating the consumption of Hemp with illness or other negative effects or events, could adversely affect us.  This adverse publicity could arise even if the adverse effects associated with Hemp derived products resulted from consumers' failure to use such products legally, appropriately or as directed.

***The reputation of our Company may be adversely affected by events outside of our control.***

Certain events or developments in the Hemp industry more generally may impact our reputation.  Damage to our reputation can result from the actual or perceived occurrence of any number of events, including any negative publicity, whether true or not.  Further, many of these events are likely to be outside of our control or not as a result of any actions taken or not taken by us.

***We may not be able to obtain adequate insurance coverage to insure the risks facing our Company.***

We may not be able to obtain adequate insurance coverage in respect of the risks we and our business face, the premiums for such insurance may not continue to be commercially justifiable or there may be coverage limitations and other exclusions which may result in such insurance not being sufficient to cover potential liabilities that we face.

***We may become subject to liability arising from any fraudulent or illegal activity by our employees, contractors, consultants and others.***

We are exposed to the risk that our employees, independent contractors, consultants, service providers and licensors may engage in fraudulent or other illegal activity.  Misconduct by these parties could include intentional undertakings of unauthorized activities, or reckless or negligent undertakings of authorized activities, in each case on our behalf or in our service that violate: (i) government regulations, (ii) manufacturing standards, (iii) laws that require the true, complete and accurate reporting of financial information or data, and (iv) the terms of our agreements with insurers.  In particular, we could be exposed to class action and other litigation, increased department of health inspections and related sanctions, the loss of current GMP compliance certifications or the inability to obtain future GMP compliance certifications, lost sales and revenue or reputational damage as a result of prohibited activities that are undertaken in the growing or production process of our products without our knowledge or permission and contrary to our internal policies, procedures and operating requirements.

We cannot always identify and prevent misconduct by our employees and other third parties, including service providers and licensors, and the precautions taken by us to detect and prevent this activity may not be effective in controlling unknown, unanticipated or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from such misconduct.  If any such actions are instituted against us, and we are not successful in

defending ourselves or asserting our rights, those actions could have a significant impact on our business, including the imposition of civil, criminal or administrative penalties, damages, monetary fines and contractual damages, reputational harm, diminished profits and future earnings or curtailment of our operations.

***We may be subject to risks related to our information technology systems, including the risk that we may be the subject of a cyber-attack and the risk that we may be in non-compliance with applicable privacy laws.***

We intend to enter into agreements with third parties for hardware, software, telecommunications and other information technology, or IT, services in connection with our operations. Our operations depend, in part, on how well we and our vendors protect networks, equipment, IT systems and software against damage from a number of threats, including, but not limited to, cable cuts, damage to physical plants, natural disasters, intentional damage and destruction, fire, power loss, hacking, computer viruses, vandalism or theft. Our operations also depend on the timely maintenance, upgrade and replacement of networks, equipment and IT systems and software, as well as preemptive expenses to mitigate the risks of failures. Any of these and other events could result in information system failures, delays or increases in capital expenses. The failure of information systems or a component of information systems could, depending on the nature of any such failure, adversely impact our reputation and results of operations.

***Our costs will increase if we access the public markets.***

We intend to access the public markets in the next twelve to eighteen months. We will incur increased costs as a result of preparing for and eventually operating as a public company and our management will be required to devote substantial time to new compliance initiatives. There can be no assurances that we will be successful in accessing the publics markets within in that time frame or ever. Our inability to bring our business public can prolong the illiquidity of your Subscribed Units.

***Our managers and officers are engaged in other business activities.***

We are subject to various potential conflicts of interest because some of our managers and officers may be engaged in a range of business activities. In addition, our managers and officers are permitted under their employment agreements with us to devote time to their outside business interests, so long as such activities do not materially or adversely interfere with their duties to us and subject to any contractual restrictions restricting such activities. These business interests could require the investment of significant time and attention by our managers and officers. In some cases, our managers and officers have fiduciary obligations associated with business interests that interfere with their ability to devote time to our business and affairs, such as business obligations related to the employment or involvement of these persons with Integrated AG LP or Verified Organic, which could adversely affect our operations.

***Tax and accounting requirements may change in ways that are unforeseen to us and we may face difficulty or be unable to implement or comply with any such changes.***

We are subject to numerous tax and accounting requirements, and changes in existing accounting or taxation rules or practices, or varying interpretations of current rules or practices, could have a significant adverse effect on our financial results, the manner in which we conduct our business or the marketability of any of our products.  Complying with the tax laws can be time consuming and expensive and could potentially subject us to penalties and fees in the future if we were to fail to comply.

The effect of recent U.S.  tax reform on us is uncertain and could adversely affect our business and financial condition.  On December 22, 2017, the legislation commonly referred to as the Tax Cuts and Jobs Act was enacted, which contains significant changes to U.S.  tax law, including, but not limited to, a reduction in the corporate tax rate, limitation of the tax deduction for interest expense (with certain exceptions), limitation of the deduction for net operating losses arising after 2017 to 80% of current year taxable income and elimination of carryback of such net operating losses, one-time taxation of offshore earnings at reduced rates regardless of whether they are repatriated, immediate deductions for certain new investments instead of deductions for depreciation expense over time, modifying or repealing many business deductions and credits, deemed repatriation of certain intangible related income and a transition to a new quasi-territorial system of taxation.  The effect of the changes made in the Tax Cuts and Jobs Act is highly uncertain, both in terms of their direct effect on the taxation of an investment in our Subscribed Units and their indirect effect on our financial condition or market conditions generally, and our business and financial condition could be adversely affected.  Furthermore, many of the provisions of the Tax Cuts and Jobs Act will require guidance through the issuance of treasury regulations in order to assess their effect.  There may be a substantial delay before such regulations are promulgated, increasing the uncertainty as to the ultimate effect of the statutory amendments on us or our Members.  There may also be technical corrections legislation proposed with respect to the Tax Cuts and Jobs Act, the effect and timing of which cannot be predicted and may be adverse to us or our Members.  In addition, it is uncertain how various states will respond to the newly enacted federal tax law.  We will continue to examine and assess the impact this tax reform legislation may have on our business.  This Subscription Agreement does not discuss any such tax legislation or the manner in which it might affect purchasers of our Subscribed Units.  We urge our Members to consult with their legal and tax advisors with respect to any such legislation and the potential tax consequences of investing in our Subscribed Units.

***We may face increasing competition from consolidation and growth in the CBD and Hemp industry.***

The industry in which we operate is in its early stages and is undergoing rapid growth and substantial change, which has resulted in an increase in competitors, consolidation and formation of strategic relationships.  Such acquisitions or other consolidating transactions could harm us in a number of ways, including by losing strategic partners if they are acquired by or enter into relationships with a competitor, losing customers, revenue and market share, or forcing us to expend greater resources to meet new or additional competitive threats, all of which could harm our operating results.  As competitors enter the market and become increasingly sophisticated, competition in the cannabis industry may intensify and place downward pressure on retail prices for products and services, which could negatively impact profitability.

***Our financial statements are unaudited and may not necessarily be indicative of our financial condition or results of operations.***

Because we have limited operating history, we have not had our financial statements audited. As such, our financial statements have not been verified by independent accountants and may not necessarily be indicative of our financial condition or results of operations.

***Actual results may vary materially from any projections provided to prospective investors.***

Any financial projections which were provided to prospective investors are forward-looking statements that are based on assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond our control. While all financial projections and estimates are necessarily speculative, we believe that the preparation of prospective financial information involves increasingly higher levels of uncertainty the further out the projection and estimate extend from the date of preparation. The assumptions and estimates underlying the projected and expected results are inherently uncertain and are subject to a wide variety of significant business, economic, regulatory and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the financial projections, estimates and targets. The inclusion of financial projection and estimates in the presentation to prospective investors should not be regarded as an indication that we or our representatives considered or consider the financial projections and estimates to be a reliable predication of future events.

We do not undertake any obligation to update or revise any forward-looking statements or projections; whether as a result of new information, future event or otherwise except as required by law. Important factors, among others that may affect actual results, including our ability to execute on our plans and strategies and the timing of these programs, our estimates of expenses and future revenues and profitability. Our estimates of the size of the markets for our products, our ability to protect our intellectual property rights, our estimate regarding our capital currency requirements, our reliance on third party suppliers, developments in the regulatory environment and general economic and market conditions impacting demand for our products.

**Risks Related to our Intellectual Property**

***We may be subject to risks related to the protection and enforcement of our intellectual property rights, or intellectual property we license from others, and may become subject to allegations that we or our licensors are in violation of intellectual property rights of third parties.***

The ownership, licensing and protection of trademarks, patents and intellectual property rights are significant aspects of our future success. Unauthorized parties may attempt to replicate or otherwise obtain and use our products and technology. Policing the unauthorized use of our current or future trademarks, patents or other intellectual property rights could be difficult, expensive, time consuming and unpredictable, as may be enforcing these rights against unauthorized use by others. Identifying the unauthorized use of intellectual property rights is difficult as we may be unable to effectively monitor and evaluate the products being distributed by our competitors, including parties such as unlicensed dispensaries and black market participants, and the processes used to produce such products. In addition, in any infringement proceeding, some or all of our trademarks, patents or other intellectual property rights or other proprietary know-how, or those we license

12

from others, or arrangements or agreements seeking to protect the same for our benefit, may be found invalid, unenforceable, anti-competitive or not infringed; may be interpreted narrowly; or could put existing intellectual property applications at risk of not being issued.

In addition, other parties may claim that our products, or those we license from others, infringe on their proprietary or patent protected rights. Such claims, whether or not meritorious, may result in the expenditure of significant financial and managerial resources and legal fees, result in injunctions or temporary restraining orders or require the payment of damages. As well, we may need to obtain licenses from third parties who allege that we have infringed on their lawful rights. Such licenses may not be available on terms acceptable to us, or at all. In addition, we may not be able to obtain or utilize on terms that are favorable to us, or at all, licenses or other rights with respect to intellectual property that we do not own.

We also rely on certain trade secrets, technical know-how and proprietary information that are not protected by patents to maintain our competitive position. Our trade secrets, technical know-how and proprietary information, which are not protected by patents, may become known to or be independently developed by competitors, which could adversely affect us.

We license some intellectual property rights, and the failure of the owner of such intellectual property to properly maintain or enforce the intellectual property underlying such licenses could have a material adverse effect on our business, financial condition and performance.

We are party to a number of licenses, including with Verified Organic, that give us rights to use third-party intellectual property that is necessary or useful to our business. Our success will depend, in part, on the ability of the licensor to maintain and enforce its licensed intellectual property, in particular, those intellectual property rights to which we have secured exclusive rights. Without protection for the intellectual property we have licensed, other companies might be able to offer substantially similar products for sale or utilize substantially similar processes, which could have a material adverse effect on us.

Any of our licensors may allege that we have breached our license agreement, whether with or without merit, and accordingly seek to terminate our license. If successful, this could result in our loss of the right to use the licensed intellectual property, which could adversely affect our ability to commercialize our products or services, as well as have a material adverse effect on us.

**Risks Related to This Offering and the Subscribed Units**

***Your ability to liquidate your investment in the Subscribed Units will be limited because of the lack of a trading market in, and restrictions on the resale or transfer of, the Subscribed Units.***

You should view the acquisition of the Subscribed Units as an illiquid investment, and you must be prepared to hold your investment indefinitely. There is no trading market for the Subscribed Units and it is uncertain when, if ever, one will develop. The Subscribed Units are not listed on a securities exchange or quoted in the over-the-counter market. In addition, subject to the limited exceptions set forth in the Operating Agreement, any transfer of the Subscribed Units requires the approval of the manager of the Company. The Operating Agreement also provides for significant

13

restrictions on the rights of members to transfer their Subscribed Units. Such restrictions may adversely impact the value of the Subscribed Units.

Moreover, we will issue the Subscribed Units pursuant to exemptions from registration contained in rules promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and under applicable state laws. Consequently, such securities will be subject to restrictions on transferability and resale, and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws. Investors in the Subscribed Units cannot transfer these securities except pursuant to an effective registration statement under the Securities Act or an exemption from registration. Any such resales or transfers must also comply with any applicable state securities law requirements. We may refuse to effect certain transfers of the Subscribed Units if such transfers would result in a violation of federal or state securities laws or the terms of the Operating Agreement.

***The offering price of the Subscribed Units was arbitrarily determined by us.***

The price at which the Subscribed Units are being offered to investors are not necessarily indicative of the value of our assets, earnings, or book value. Investors should not regard the purchase price of the Subscribed Units as an indication of the current or future value of the Company. We cannot provide any assurance that the Subscribed Units could be sold for the purchase price or for any amount.

***Distributions are not guaranteed.***

We cannot provide any assurance that we will be able to make any distributions from operations or any distribution upon the ultimate sale or other disposition of the Company or our assets. Distributions, if any, will at all times be subject to the prior payment of expenses and establishment and maintenance of reserves, and subject to the determination of the Manager.

***You will be a minority equity holder of the Company.***

Your Subscribed Units represent a minority of the equity interests of the Company. The interests of those members holding a majority of the equity interests may differ from the interests of yours and other holders of a minority of the equity interests with respect to the issuance of equity, business transactions with or sales to other companies, selection of officers and managers and other business decisions. Accordingly, you will not be able to significantly influence management decisions.

***Members may suffer substantial dilution from future issuances of equity or securities exercisable, convertible or exchangeable into equity of the Company.***

We may issue additional equity or securities exercisable, convertible or exchangeable into equity of the Company in the next several months and years, either in connection with attracting or retaining management, employees or consultants, or in private offerings to meet working capital requirements and to fund growth and expansion. Any grants or sales of additional equity will have a dilutive effect on the existing members, which could adversely affect the value of the Subscribed Units.

## **EXHIBIT C**

**INDIVIDUAL RETIREMENT ACCOUNT**

**CUSTODIAN ACKNOWLEDGEMENT FORM**

[CUSTODIAN'S LETTERHEAD]

Integrated CBD Holdings LLC
9237 E. Via De Ventura Blvd. Suite 220
Scottsdale, AZ 85258
Email: IR@Integrated-CBD.com

Re: Custodian Acknowledgement

We hereby acknowledge that we are the Custodian of record for the self-directed Individual Retirement Account ("IRA") indicated below:

Name of the individual who established the IRA: _____

Legal Name of the IRA account: _____

IRA Account Number: _____

Name of Custodian: _____

Please send statements and other information relating to the account to:
*[Custodian contact information]*

Name: _____

Mailing Address: _____

Telephone: _____

Email Address: _____

**Acknowledged:**
[NAME OF CUSTODIAN]

_____
*Signature*

_____
*Name*                              *Title*                              *Date*

15

# EXHIBIT B

DocuSign Envelope ID: D51B4B95-02D5-4A65-8FE5-D86AEFDDB881

_____

**INTEGRATED CBD HOLDINGS LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

_____

Dated as of August 16, 2019

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY ............................................................ 4

    Section 1.01    Definitions .................................................................................................. 4
    Section 1.02    Other Definitions ..................................................................................... 13
    Section 1.03    Formation; Name ..................................................................................... 14
    Section 1.04    Registered Agent and Office; Principal Office ...................................... 14
    Section 1.05    Business Purpose and Powers ................................................................. 14

ARTICLE II CAPITAL CONTRIBUTIONS; UNITS; CAPITAL ACCOUNTS ................................ 15

    Section 2.01    Units; Series of Units .............................................................................. 15
    Section 2.02    Voting ...................................................................................................... 16
    Section 2.03    Ownership Exhibit .................................................................................. 16
    Section 2.04    Issuances of Series P Units to Service Providers ................................... 17
    Section 2.05    Authority to Create and Issue Units and Unit Equivalents .................... 18
    Section 2.06    Additional Capital Contributions ........................................................... 19
    Section 2.07    Capital Accounts ..................................................................................... 19
    Section 2.08    Compliance with Regulations ................................................................. 20
    Section 2.09    No Interest ............................................................................................... 21
    Section 2.10    No Deficit Make-Up ................................................................................ 21
    Section 2.11    Loans ....................................................................................................... 21
    Section 2.12    Withdrawal and Return of Capital .......................................................... 21
    Section 2.13    Limited Liability of Members ................................................................. 21
    Section 2.14    Unit Certificates ...................................................................................... 21
    Section 2.15    Uniform Commercial Code ..................................................................... 21

ARTICLE III DISTRIBUTIONS ......................................................................................................... 21

    Section 3.01    Distributions ............................................................................................ 21
    Section 3.02    Amounts Withheld .................................................................................. 22
    Section 3.03    Tax Distributions .................................................................................... 23
    Section 3.04    Distributions in Kind .............................................................................. 23
    Section 3.05    Member Payments Constituting Distributions ....................................... 23
    Section 3.06    Distributions with Respect to Unvested Units ....................................... 23

ARTICLE IV PROFITS AND LOSSES ............................................................................................... 24

    Section 4.01    Allocation of Profits and Losses ............................................................ 24
    Section 4.02    Special Allocations ................................................................................. 24
    Section 4.03    Allocation During Year .......................................................................... 25
    Section 4.04    Tax Allocations ....................................................................................... 25
    Section 4.05    Tax Credits .............................................................................................. 26
    Section 4.06    Depreciation Recapture .......................................................................... 26
    Section 4.07    Intent of Allocations ............................................................................... 26

ARTICLE V MANAGEMENT OF COMPANY .................................................................................. 26

    Section 5.01    Management of the Company .................................................................. 26
    Section 5.02    Resignation and Removal of Manager .................................................... 27
    Section 5.03    Meetings of Members; Written Consents ............................................... 27
    Section 5.04    Contracts with Affiliates ......................................................................... 27
    Section 5.05    Company Expenses ................................................................................. 27

| | | |
|---|---|---|
| Section 5.06 | Officers | 27 |
| Section 5.07 | Fiduciary Duties; Insurance | 28 |
| Section 5.08 | Actions of Members | 28 |

**ARTICLE VI BOOKS AND RECORDS; TAX AND FINANCIAL MATTERS** ...... 28

| | | |
|---|---|---|
| Section 6.01 | Books and Records | 28 |
| Section 6.02 | Fiscal Year | 28 |
| Section 6.03 | Reports | 28 |
| Section 6.04 | Tax Matters | 29 |
| Section 6.05 | Bank Accounts and Temporary Investments | 31 |
| Section 6.06 | Classification as a Partnership | 31 |

**ARTICLE VII TRANSFERS, ADMISSIONS, AND WITHDRAWALS** ...... 31

| | | |
|---|---|---|
| Section 7.01 | Transfers | 31 |
| Section 7.02 | Conditions to Admission as a Member | 32 |
| Section 7.03 | No Withdrawal | 33 |
| Section 7.04 | Permitted Transfers | 33 |
| Section 7.05 | Right of First Refusal | 33 |
| Section 7.06 | Tag-Along Rights | 36 |
| Section 7.07 | Drag-Along Rights | 38 |
| Section 7.08 | Miscellaneous Transfer Restrictions | 40 |
| Section 7.09 | Pledge of Units | 40 |
| Section 7.10 | Preemptive Rights | 41 |

**ARTICLE VIII MANDATORY OFFERS BY SERIES A MEMBERS, FRIENDS & FAMILY MEMBERS, SERIES P MEMBERS AND SERIES SEED MEMBERS** ...... 43

| | | |
|---|---|---|
| Section 8.01 | Deemed Offers | 43 |
| Section 8.02 | Triggering Events | 44 |
| Section 8.03 | Permitted Transferees of a Member | 45 |
| Section 8.04 | Exercise of Company Option | 45 |

**ARTICLE IX TERMINATION AND DISSOLUTION** ...... 46

| | | |
|---|---|---|
| Section 9.01 | Dissolution Events | **Error! Bookmark not defined.** |
| Section 9.02 | Liquidation | 46 |
| Section 9.03 | Distribution In-Kind | 47 |
| Section 9.04 | Certificate of Cancellation | 47 |
| Section 9.05 | Effect of Filing of Certificate of Cancellation | 47 |
| Section 9.06 | Return of Contribution Nonrecourse to Other Members | 47 |

**ARTICLE X EXCULPATION AND INDEMNIFICATION** ...... 47

| | | |
|---|---|---|
| Section 10.01 | Liability of Members | 47 |
| Section 10.02 | Indemnification of Covered Persons | 47 |
| Section 10.03 | Indemnification Procedure | 48 |
| Section 10.04 | Company Assets Used First | 48 |
| Section 10.05 | No Presumption | 48 |
| Section 10.06 | Insurance | 49 |
| Section 10.07 | Advance | 49 |
| Section 10.08 | Survival | 49 |

**ARTICLE XI REPRESENTATIONS** ...... 49

| | | |
|---|---|---|
| Section 11.01 | General | 49 |

ii

Section 11.02    Investment Representations. ............................... **Error! Bookmark not defined.**

ARTICLE XII MISCELLANEOUS ............................................................................................51

Section 12.01    Notices ...........................................................................................................51
Section 12.02    Parties Bound; No Third Party Beneficiaries.............................................51
Section 12.03    Governing Law; Submission to Jurisdiction; Waivers ..............................51
Section 12.04    Waiver of Jury Trial; Punitive and Consequential Damages.....................52
Section 12.05    Amendment....................................................................................................52
Section 12.06    Entire Agreement..........................................................................................53
Section 12.07    Severability....................................................................................................53
Section 12.08    Counterparts; Facsimile or Electric Transmission .....................................53
Section 12.09    Construction...................................................................................................53
Section 12.10    Headings and Captions .................................................................................53
Section 12.11    No Waiver.......................................................................................................53
Section 12.12    Additional Instruments .................................................................................54
Section 12.13    Confidentiality ..............................................................................................54
Section 12.14    Publicity.........................................................................................................54
Section 12.15    Member Estoppel Certificates.......................................................................55
Section 12.16    Remedies........................................................................................................55
Section 12.17    Specific Performance ....................................................................................55
Section 12.18    Counsel to the Company ...............................................................................55

EXHIBITS

| EXHIBIT A | CAPITAL CONTRIBUTIONS, UNITS, SERIES AND PERCENTAGE INTERESTS |
|---|---|
| EXHIBIT B | JOINDER AGREEMENT |
| EXHIBIT C | SPOUSAL CONSENT AND AGREEMENT |
| EXHIBIT D | FORM OF NON-NEGOTIABLE PROMISSORY NOTE |
| EXHIBIT E | FORM OF REDEMPTION AGREEMENT |
| EXHIBIT "F" | FORM OF MUTUAL RELEASE AGREEMENT |

**INTEGRATED CBD HOLDINGS LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

This Limited Liability Company Agreement (this "<u>Agreement</u>") of Integrated CBD Holdings LLC, a Delaware limited liability company (the "<u>Company</u>"), is entered into effective as of the 16th day of August, 2019 (the "<u>Effective Date</u>") by and among the Company and the parties whose names are set forth as Members on <u>Exhibit "A"</u> attached hereto.

<u>BACKGROUND</u>

A.      The Company was formed on July 26, 2019, by the filing of a Certificate by an authorized Person of the Company.

B.      The Members desire to enter into this Agreement to set forth certain agreements among themselves relating to, among other things, the governance of the Company and granting certain rights and imposing certain restrictions on themselves and the Units.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**ARTICLE I**
**DEFINED TERMS; OPERATION OF COMPANY**

**Section 1.01**      <u>Definitions</u>. Within the context of this Agreement, the following terms shall have the following meanings:

"<u>Accredited Investor</u>" has the meaning set forth in Rule 501 of Regulation D under the Securities Act as currently in effect.

"<u>Act</u>" means the Delaware Limited Liability Company Act, as the same may be amended from time to time.

"<u>Adjusted Capital Account</u>" means a Member's Capital Account, adjusted as follows: (a) any deficit balance in a Member's Capital Account shall be reduced by any amount that the Member is obligated to restore to the Company, or any amount the Member is treated as obligated to restore to the Company under Treasury Regulation Section 1.704-1(b)(2)(ii)(c), Treasury Regulation Section 1.704-2(g) and Treasury Regulation Section 1.704-2(i)(5); and (b) a Member's Capital Account shall be adjusted for items specified in subsections (4), (5), and (6) of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

"<u>Affiliate</u>" means, with respect to any Person, (a) any Person directly or indirectly controlling, controlled by, or under common control with such Person, (b) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of such Person, (c) any officer, director, general partner, manager or trustee of such Person, and (d) any family member of any Person described in clause (a), (b) or (c) above. For purposes of this definition, "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Applicable Federal Rate</u>" shall have the meaning set forth in Section 1274(d) of the Code.

(j)      all documents, records and books pertaining to its investment have been made available for inspection by Member and by its consultants, auditors and counsel;

(k)      it has not paid or given to any third party any commission or other remuneration in connection with the purchase of the Units; and it has not received any public media advertisements and has not been solicited by any form of mass mailing solicitation;

(l)      it understands the meaning and legal consequences of the foregoing representations and warranties and acknowledges and agrees that the Company is relying upon the representations and warranties made herein in determining to sell it the Units; and it certifies that each of the foregoing representations and warranties is true and correct as of the date hereof and shall survive the execution hereof and the purchase of the Units;

(m)      it acknowledges that no Units may be Transferred in the absence of registration under the Securities Act and applicable Blue Sky or securities laws or an applicable exemption thereunder; and

(n)      any amounts invested in the Company are not and will not be directly or indirectly derived from activities that may contravene federal, state, local or international laws and regulations, including anti-money laundering laws and regulations.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.01**   Notices. All notices, consents or other communications required to be given pursuant to this Agreement shall be deemed validly given, made or served only if in writing, addressed to the Company, the Board or the Members at the address, facsimile number or email address (as the case may be) set forth in the books and records of the Company: (a) when delivered personally, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, or if not during such hours, then on the next business day, (c) three (3) calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, (d) when delivered by electronic mail accompanied by a "delivered" and "read" receipt, or (e) one (1) day after deposit with a nationally recognized overnight or same-day courier, specifying next day or same-day delivery, with written verification of receipt. The designation of the Person to receive such notice, approval, consent or other communication on behalf of a Member or the address of any such Person for the purposes thereof may be changed from time to time by written notice given to the Company pursuant to this Section 12.01.

**Section 12.02**   Parties Bound; No Third Party Beneficiaries. This Agreement shall inure to the benefit of and shall be binding upon all of the Parties and their respective successors, assigns, heirs and beneficiaries. Except for Covered Persons, no provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto. Each Covered Person shall be a third party beneficiary of ARTICLE X and shall be entitled to enforce the provisions thereof.

**Section 12.03**   Governing Law; Submission to Jurisdiction; Waivers. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware, without giving effect to any conflicts of law principles. Each of the Members agrees that if any dispute is not resolved by the parties, it shall be resolved only in the Courts of the State of Delaware sitting in New Castle County or the United States District Court for the State of Delaware and the appellate courts having jurisdiction of appeals in such courts (collectively, the "Proper Courts"). In that context, and without limiting the generality of the foregoing, each of the Members irrevocably and unconditionally (a) submits

for itself and its property in any action relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Proper Courts and agrees that all claims in respect of any such action shall be heard and determined in such courts in the State of Delaware, to the extent permitted by law; (b) consents that any such action may and shall be brought in such courts and waives any objection that it may now or thereafter have to the venue or jurisdiction of any such action in any such court or that such action was brought in an inconvenient court and agrees not to plead or claim the same; (c) agrees that service of process in any such action may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address that is on record at the principal office of the Company; and (d) agrees that nothing in this Agreement or any document delivered pursuant to this Agreement shall affect the right to effect service of process in any other manner permitted by the Laws of the State of Delaware.

**Section 12.04**   <u>Waiver of Jury Trial; Punitive and Consequential Damages</u>. EACH PARTY HEREBY (A) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR ASSOCIATED HEREWITH; (B) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION BY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY LOST PROFITS), OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (C) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND (D) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AMONG OTHER THINGS, BY THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS Section 12.04.

**Section 12.05**   <u>Amendment</u>.

(a)      Except as provided for in <u>Section 6.04(d)</u>, this Agreement may be amended with the written consent of the Members holding a Required Interest of the Units.

(b)      In addition, amendments may be made to this Agreement from time to time by the Board without the consent of any of the Members: (i) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to add any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the existing provisions of this Agreement; (ii) to add to the representations, duties or obligations of the Company or to surrender any right or power granted to the Company herein; (iii) to delete from or add to any provision hereof required to be so deleted or added by a state "Blue Sky" commission, which addition or deletion is deemed by such commission to be for the benefit or protection of the Members; or (iv) as required to apply <u>Section 2.03(c)</u>.

(c)      If this Agreement is amended (or amended and restated) in accordance herewith and a Member is not required pursuant to the terms hereof to execute the amendment (or amendment and restatement), such Member's execution of this Agreement shall be definitive evidence of the binding nature of the amendment (or amendment and restatement) on such Member.

(d)      Notwithstanding the provisions of this Agreement (including the foregoing provisions of this <u>Section 12.05</u>), it is hereby acknowledged and agreed that the Board, on behalf of the

# EXHIBIT C



www.Integrated-CBD.com

# LEGAL DISCLAIMER



THIS IS NOT AN OFFER TO BUY OR SELL SECURITIES, OR A SOLICITATION OF AN OFFER TO BUY OR SELL SECURITIES. THIS PRESENTATION IS INTENDED FOR INFORMATIONAL PURPOSES ONLY.

CERTAIN STATEMENTS CONTAINED IN THIS PRESENTATION CONSTITUTE FORWARD LOOKING STATEMENTS AND FORWARD LOOKING INFORMATION (COLLECTIVELY, "FORWARD LOOKING STATEMENTS"). SUCH FORWARD LOOKING STATEMENTS RELATE TO POSSIBLE EVENTS, CONDITIONS OR FINANCIAL PERFORMANCE OF THE COMPANY BASED ON FUTURE ECONOMIC CONDITIONS AND COURSES OF ACTION. ALL STATEMENTS OTHER THAN STATEMENTS OF HISTORICAL FACT ARE FORWARD LOOKING STATEMENTS. THE USE OF ANY WORDS OR PHRASES SUCH AS "SEEK", "ANTICIPATE", "PLAN", "CONTINUE", "ESTIMATE", "EXPECT", "MAY", "WILL", "PROJECT", "PREDICT", "POTENTIAL", "TARGETING", "INTEND", "COULD", "MIGHT", "SHOULD", "BELIEVE", "WILL LIKELY RESULT", "ARE EXPECTED TO", "WILL CONTINUE", "IS ANTICIPATED", "BELIEVES", "ESTIMATED", "INTENDS", "PLANS", "PROJECTION", "OUTLOOK" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD LOOKING STATEMENTS. THESE STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, ASSUMPTIONS, UNCERTAINTIES AND OTHER FACTORS THAT MAY CAUSE ACTUAL RESULTS OR EVENTS TO DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD LOOKING STATEMENTS. THE COMPANY BELIEVES THERE IS A REASONABLE BASIS FOR THE EXPECTATIONS REFLECTED IN THE FORWARD LOOKING STATEMENTS, HOWEVER NO ASSURANCE CAN BE GIVEN THAT THESE EXPECTATIONS WILL PROVE TO BE CORRECT AND THE FORWARD LOOKING STATEMENTS INCLUDED IN THIS PRESENTATION SHOULD NOT BE UNDULY RELIED UPON BY INVESTORS. THE FORWARD LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE OF THIS PRESENTATION AND ARE EXPRESSLY QUALIFIED, IN THEIR ENTIRETY, BY THIS CAUTIONARY STATEMENT.

IN ADDITION, THE COMPANY'S ASSESSMENT OF, AND TARGETS FOR, WHOLESALE SALES OF BIOMASS AND HEMP DERIVED CBD PRODUCTS, SALES OF HEMP DERIVED CBD PRODUCTS AND EXPANSION OF RETAIL LOCATIONS THROUGH WHICH THE COMPANY'S PRODUCTS MAY BE SOLD, EXPANSION OF THE COMPANY'S DISTRIBUTION CHANNELS, INCLUDING OVERSEAS DISTRIBUTION, DEVELOPMENT OF IMPROVEMENTS TO THE COMPANY'S PRODUCTS AND RELATED BIOAVAILABILITY TECHNOLOGY, THE ISOLATION OF ADDITIONAL CANNABINOID PRODUCTS, RESEARCH PARTNERSHIPS, RULES AND REGULATIONS, ANNUAL REVENUE, AND EBITDA, ARE CONSIDERED FORWARD LOOKING STATEMENTS.

THE FORWARD LOOKING STATEMENTS AND OTHER FORWARD LOOKING INFORMATION ARE BASED ON MANAGEMENT'S OPINIONS, ESTIMATES AND ASSUMPTIONS IN LIGHT OF OUR EXPERIENCE AND PERCEPTION OF HISTORICAL TRENDS, CURRENT TRENDS, CURRENT CONDITIONS AND EXPECTED FUTURE DEVELOPMENTS, AS WELL AS OTHER FACTORS THAT MANAGEMENT CURRENTLY BELIEVES APPROPRIATE AND REASONABLE IN THE CIRCUMSTANCES. DESPITE A CAREFUL PROCESS TO PREPARE AND REVIEW THE FORWARD LOOKING STATEMENTS, THERE CAN BE NO ASSURANCE THAT THE UNDERLYING OPINIONS, ESTIMATES, AND ASSUMPTIONS WILL PROVE TO BE CORRECT.

ALL OF THE FORWARD LOOKING INFORMATION CONTAINED IN THIS PRESENTATION IS EXPRESSLY QUALIFIED BY THE FOREGOING CAUTIONARY STATEMENTS. INVESTORS SHOULD READ THE ENTIRE PRIVATE PLACEMENT MEMORANDUM AND CONSULT THEIR OWN PROFESSIONAL ADVISORS TO ASCERTAIN AND ASSESS THE INCOME TAX, LEGAL, RISK FACTORS AND OTHER ASPECTS OF THEIR INVESTMENT IN ANY SECURITIES OF THE COMPANY.

# EXHIBIT D



INTEGRATED CBD

INVESTOR PRESENTATION

August 2019

STRICTLY CONFIDENTIAL

www.Integrated-CBD.com

# LEGAL DISCLAIMER



THIS IS NOT AN OFFER TO BUY OR SELL SECURITIES, OR A SOLICITATION OF AN OFFER TO BUY OR SELL SECURITIES. THIS PRESENTATION IS INTENDED FOR INFORMATIONAL PURPOSES ONLY.

CERTAIN STATEMENTS CONTAINED IN THIS PRESENTATION CONSTITUTE FORWARD LOOKING STATEMENTS AND FORWARD LOOKING INFORMATION (COLLECTIVELY, "FORWARD LOOKING STATEMENTS"). SUCH FORWARD LOOKING STATEMENTS RELATE TO POSSIBLE EVENTS, CONDITIONS OR FINANCIAL PERFORMANCE OF THE COMPANY BASED ON FUTURE ECONOMIC CONDITIONS AND COURSES OF ACTION. ALL STATEMENTS OTHER THAN STATEMENTS OF HISTORICAL FACT ARE FORWARD LOOKING STATEMENTS. THE USE OF ANY WORDS OR PHRASES SUCH AS "SEEK", "ANTICIPATE", "PLAN", "CONTINUE", "ESTIMATE", "EXPECT", "MAY", "WILL", "PROJECT", "PREDICT", "POTENTIAL", "TARGETING", "INTEND", "COULD", "MIGHT", "SHOULD", "BELIEVE", "WILL LIKELY RESULT", "ARE EXPECTED TO", "WILL CONTINUE", "IS ANTICIPATED", "BELIEVES", "ESTIMATED", "INTENDS", "PLANS", "PROJECTION", "OUTLOOK" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD LOOKING STATEMENTS. THESE STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, ASSUMPTIONS, UNCERTAINTIES AND OTHER FACTORS THAT MAY CAUSE ACTUAL RESULTS OR EVENTS TO DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD LOOKING STATEMENTS. THE COMPANY BELIEVES THERE IS A REASONABLE BASIS FOR THE EXPECTATIONS REFLECTED IN THE FORWARD LOOKING STATEMENTS, HOWEVER NO ASSURANCE CAN BE GIVEN THAT THESE EXPECTATIONS WILL PROVE TO BE CORRECT AND THE FORWARD LOOKING STATEMENTS INCLUDED IN THIS PRESENTATION SHOULD NOT BE UNDULY RELIED UPON BY INVESTORS. THE FORWARD LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE OF THIS PRESENTATION AND ARE EXPRESSLY QUALIFIED, IN THEIR ENTIRETY, BY THIS CAUTIONARY STATEMENT.

IN ADDITION, THE COMPANY'S ASSESSMENT OF, AND TARGETS FOR, WHOLESALE SALES OF BIOMASS AND HEMP DERIVED CBD PRODUCTS, SALES OF HEMP DERIVED CBD PRODUCTS AND EXPANSION OF RETAIL LOCATIONS THROUGH WHICH THE COMPANY'S PRODUCTS MAY BE SOLD, EXPANSION OF THE COMPANY'S DISTRIBUTION CHANNELS, INCLUDING OVERSEAS DISTRIBUTION, DEVELOPMENT OF IMPROVEMENTS TO THE COMPANY'S PRODUCTS AND RELATED BIOAVAILABILITY TECHNOLOGY, THE ISOLATION OF ADDITIONAL CANNABINOID PRODUCTS, RESEARCH PARTNERSHIPS, RULES AND REGULATIONS, ANNUAL REVENUE, AND EBITDA, ARE CONSIDERED FORWARD LOOKING STATEMENTS.

THE FORWARD LOOKING STATEMENTS AND OTHER FORWARD LOOKING INFORMATION ARE BASED ON MANAGEMENT'S OPINIONS, ESTIMATES AND ASSUMPTIONS IN LIGHT OF OUR EXPERIENCE AND PERCEPTION OF HISTORICAL TRENDS, CURRENT TRENDS, CURRENT CONDITIONS AND EXPECTED FUTURE DEVELOPMENTS, AS WELL AS OTHER FACTORS THAT MANAGEMENT CURRENTLY BELIEVES APPROPRIATE AND REASONABLE IN THE CIRCUMSTANCES. DESPITE A CAREFUL PROCESS TO PREPARE AND REVIEW THE FORWARD LOOKING STATEMENTS, THERE CAN BE NO ASSURANCE THAT THE UNDERLYING OPINIONS, ESTIMATES, AND ASSUMPTIONS WILL PROVE TO BE CORRECT.

ALL OF THE FORWARD LOOKING INFORMATION CONTAINED IN THIS PRESENTATION IS EXPRESSLY QUALIFIED BY THE FOREGOING CAUTIONARY STATEMENTS. INVESTORS SHOULD READ THE ENTIRE PRIVATE PLACEMENT MEMORANDUM AND CONSULT THEIR OWN PROFESSIONAL ADVISORS TO ASCERTAIN AND ASSESS THE INCOME TAX, LEGAL, RISK FACTORS AND OTHER ASPECTS OF THEIR INVESTMENT IN ANY SECURITIES OF THE COMPANY.

# EXHIBIT E




INTEGRATED CBD

NOVEMBER 2019

WWW.INTEGRATED-CBD.COM

# CONFIDENTIALITY, LEGAL DISCLAIMER AND CONTACT INFORMATION

THIS IS NOT AN OFFER TO BUY OR SELL SECURITIES, OR A SOLICITATION OF AN OFFER TO BUY OR SELL SECURITIES. THIS PRESENTATION IS INTENDED FOR INFORMATIONAL PURPOSES ONLY.

CERTAIN STATEMENTS CONTAINED IN THIS PRESENTATION CONSTITUTE FORWARD LOOKING STATEMENTS AND FORWARD LOOKING INFORMATION (COLLECTIVELY, "FORWARD LOOKING STATEMENTS"). SUCH FORWARD LOOKING STATEMENTS RELATE TO POSSIBLE EVENTS, CONDITIONS OR FINANCIAL PERFORMANCE OF THE COMPANY BASED ON FUTURE ECONOMIC CONDITIONS AND COURSES OF ACTION. ALL STATEMENTS OTHER THAN STATEMENTS OF HISTORICAL FACT ARE FORWARD LOOKING STATEMENTS. THE USE OF ANY WORDS OR PHRASES SUCH AS "SEEK", "ANTICIPATE", "PLAN", "CONTINUE", "ESTIMATE", "EXPECT", "MAY", "WILL", "PROJECT", "PREDICT", "POTENTIAL", "TARGETING", "INTEND", "COULD", "MIGHT", "SHOULD", "BELIEVE", "WILL LIKELY RESULT", "ARE EXPECTED TO", "WILL CONTINUE", "IS ANTICIPATED", "BELIEVES", "ESTIMATED", "INTENDS", "PLANS", "PROJECTION", "OUTLOOK" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD LOOKING STATEMENTS. THESE STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, ASSUMPTIONS, UNCERTAINTIES AND OTHER FACTORS THAT MAY CAUSE ACTUAL RESULTS OR EVENTS TO DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD LOOKING STATEMENTS. THE COMPANY BELIEVES THERE IS A REASONABLE BASIS FOR THE EXPECTATIONS REFLECTED IN THE FORWARD LOOKING STATEMENTS, HOWEVER NO ASSURANCE CAN BE GIVEN THAT THESE EXPECTATIONS WILL PROVE TO BE CORRECT AND THE FORWARD LOOKING STATEMENTS INCLUDED IN THIS PRESENTATION SHOULD NOT BE UNDULY RELIED UPON BY INVESTORS. THE FORWARD LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE OF THIS PRESENTATION AND ARE EXPRESSLY QUALIFIED, IN THEIR ENTIRETY, BY THIS CAUTIONARY STATEMENT.

IN ADDITION, THE COMPANY'S ASSESSMENT OF, AND TARGETS FOR, WHOLESALE SALES OF BIOMASS AND HEMP DERIVED CBD PRODUCTS, SALES OF HEMP DERIVED CBD PRODUCTS AND EXPANSION OF RETAIL LOCATIONS THROUGH WHICH THE COMPANY'S PRODUCTS MAY BE SOLD, EXPANSION OF THE COMPANY'S DISTRIBUTION CHANNELS, INCLUDING OVERSEAS DISTRIBUTION, DEVELOPMENT OF IMPROVEMENTS TO THE COMPANY'S PRODUCTS AND RELATED BIOAVAILABILITY TECHNOLOGY, THE ISOLATION OF ADDITIONAL CANNABINOID PRODUCTS, RESEARCH PARTNERSHIPS, RULES AND REGULATIONS, ANNUAL REVENUE, AND EBITDA, ARE CONSIDERED FORWARD LOOKING STATEMENTS.

THE FORWARD LOOKING STATEMENTS AND OTHER FORWARD LOOKING INFORMATION ARE BASED ON MANAGEMENT'S OPINIONS, ESTIMATES AND ASSUMPTIONS IN LIGHT OF OUR EXPERIENCE AND PERCEPTION OF HISTORICAL TRENDS, CURRENT TRENDS, CURRENT CONDITIONS AND EXPECTED FUTURE DEVELOPMENTS, AS WELL AS OTHER FACTORS THAT MANAGEMENT CURRENTLY BELIEVES APPROPRIATE AND REASONABLE IN THE CIRCUMSTANCES. DESPITE A CAREFUL PROCESS TO PREPARE AND REVIEW THE FORWARD LOOKING STATEMENTS, THERE CAN BE NO ASSURANCE THAT THE UNDERLYING OPINIONS, ESTIMATES, AND ASSUMPTIONS WILL PROVE TO BE CORRECT.

ALL OF THE FORWARD LOOKING INFORMATION CONTAINED IN THIS PRESENTATION IS EXPRESSLY QUALIFIED BY THE FOREGOING CAUTIONARY STATEMENTS. INVESTORS SHOULD READ THE ENTIRE PRIVATE PLACEMENT MEMORANDUM AND CONSULT THEIR OWN PROFESSIONAL ADVISORS TO ASCERTAIN AND ASSESS THE INCOME TAX, LEGAL, RISK FACTORS AND OTHER ASPECTS OF THEIR INVESTMENT IN ANY SECURITIES OF THE COMPANY.

NO HEALTH CLAIMS ARE MADE, EXPRESSED OR IMPLIED BY INTEGRATED CBD REGARDING THE EFFICACY OR HEALTH IMPACT OF CANNIDINOIDS.

**Patrick Horsman, CFO**
President & CEO
PH@integrated-cbd.com

**Russell Gross**
CFO
RG@integrated-cbd.com

**Brittany Parisi**
Investor Relations
BP@integrated-cbd.com

